**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| IN RE: | ) | No. 17-51160 |
| Robert Rossman | ) | Chapter 7 |
| Debtor | ) | |
| Guardian Alarm Services, Inc. | ) | Adv. No. 18-05010 |
| Plaintiff | ) | |
| vs. | ) | |
| Robert Rossman | ) | |
| Defendant | ) | August 3, 2018 |

**MOTION FOR SUMMARY JUDGMENT**

**I. FACTS**

In and prior to February 1997, Defendant and Jerome Terracino ("Terracino") were employees, directors and officers of Guardian Systems, Inc. ("Guardian"). Defendant held a 25% interest in Guardian and Terracino held a 75% interest. Affidavit of Michael Lynch, Exhibit A (Bates 0001).

Based on allegations arising out of that relationship, on or about April, 2000 Defendant filed a Superior Court case against Plaintiff and other Defendants captioned Rossman v. Morasco, FST-CV01-0183603 Affidavit of Michael Lynch, ¶2, Exhibit K (Bates 1311). (the "Superior Court Action"). Said case was assigned to the complex litigation docket, and afterwards bore the docket number X05-018360. Affidavit of Michael Lynch, ¶2, Exhibit K (Bates 1311).

Plaintiff counterclaimed in the Superior Court Action based on its relationship with Defendant, alleging, in part, as follows:

- In or about February, 1997, and in the months prior thereto, Defendant, while serving as employee, officer and director of Guardian Systems, Inc. ("Guardian"), and while holding a shareholder interest in Guardian, engaged in a variety of dishonest and disloyal acts with the assistance of his wife and certain other employees of Guardian.

- On March 18, 1997, Defendant was terminated as an employee, officer and director of Guardian after Terracino learned of the dishonest and disloyal conduct carried out by Defendant.  Prior to and after his dismissal, Defendant continued to use confidential information stolen from Guardian to interfere with Guardian customer relationships by convincing Guardian customers to terminate their contracts with Guardian and to switch their accounts from Guardian to United Alarm Company, a company owned and/or controlled by Defendant.

- In speaking with Guardian customers, Defendant made negative and harmful statements about Guardian and Terracino which were false and were known to be false by Defendant when made, all in an effort to persuade said customers to terminate their contractual agreements with Guardian and switch to United Alarm, and to terminate their business relationships and dealings with Terracino.

- In a further effort to coerce Guardian customers to switch their accounts, Defendant told various Guardian customers that they could breach their monitoring and service contracts with Guardian without penalty, although he knew that such statements were false when they were made.

- On or about August 29, 1997 Guardian sold almost all of its assets to Plaintiff, including all its alarm monitoring and maintenance accounts.

2

- After August 29, 1997 Defendant continued to carry out devious, dishonest and fraudulent conduct against Plaintiff in order to steal its accounts for his own company, United Alarm, in order to diminish Plaintiff's value and to build the volume, revenues and worth of United Alarm at the expense of Plaintiff.

- Since September 1997 Defendant, either individually or by his agents, servants and employees, stole approximately 200 accounts from Plaintiff utilizing the above-described methods and procedures, and coerced numerous builders to divert their business referrals from Plaintiff to United Alarm, all to the detriment and loss of Plaintiff.

- As a result of Defendant's conduct, Plaintiff suffered lost accounts, lost profits, and lost revenues, and was also forced to incur substantial costs and expenses, including legal fees, to defend itself against Defendant's scurrilous and fraudulent conduct, all to its detriment.

- Defendant's actions, in coercing Plaintiff's customers to switch their accounts to Defendant's company, were improper and constituted tortious interference with the contractual relationships existing between Plaintiff and its customers.  Further, Defendant's actions in coercing Plaintiff's employees to leave Plaintiff and commence employment with his company also constituted tortious interference with the employment agreements between Plaintiff and its employees.

- The purpose of Defendant's actions were to wreck and loot the corporation to its detriment, thus devaluing the company's assets and leaving its shareholders with a reduced share value in the corporation.  As a result of Defendant's conduct in this regard, Plaintiff and its shareholders suffered harm and claim damages.

3

.      Defendant purchased a note on which both he's intent in purchasing the note for himself

was to enforce it against his co- guarantors Terracino and Guardian or to use it as leverage

against Terracino and Guardian to take further customer accounts from Guardian for his own

business, United Alarm.

The above allegations are more particularly set forth in Plaintiff's First Revised Answer

of May 10, 2002.  Affidavit of Michael Lynch, Exhibit B (Bates 0020).

The Superior Court Action was tried to a jury in July of 2005.  By the time the matter

reached the jury, the operative pleadings in the Superior Court Action as to Plaintiff's

counterclaim were as follows:

- Second Count, Corporate Derivate Claim; Third Count, Constructive Trust,

Fourth Count, Tortious Interference with Contract; Sixth Count, Unfair Trade Practices (

CUTPA"), and Seventh Count, Unjust Enrichment.  Due to previous Court rulings the

Sixth Count and Seventh Count were operative only as to Defendant Guardian Alarm

Systems, Inc.  In addition, the Second, Third and Fourth Counts sought relief only on

behalf of Guardian Alarm Systems, Inc.

- Plaintiff's Answer and Special Defenses, dated September 15, 2003.

Affidavit of Michael Lynch, Exhibit E (Bates 0046-0049).

The matter proceeded through trial, and evidence was taken.  At the close of the evidence

the Court instructed the jury as follows:

> In order to succeed on these claims, Guardian Alarm must prove them by a
> preponderance of the evidence. One aspect of these claims is Guardian Alarm's
> allegation that Mr. Rossman tortiously, that is wrongfully, interfered with
> Guardian Alarm's contractual relationships with its customers. He interfered with
> Guardian Alarm's contractual relationships with its customers. To succeed on that
> element of its claim, Guardian Alarm must prove several things by a
> preponderance of the credible evidence.

4

First it must prove that it had a contractual relationship with the customers at issue. A contract may be in writing or it may be oral or it may exist based on the conduct of the parties involved.

Second, Guardian Alarm must prove that Mr. Rossman knew of the contract, not necessarily the details thereof, but of its existence.

Third, Guardian Alarm must prove that Mr. Rossman interfered with the contract in a wrongful manner. For instance, competing for the same business is not wrongful. Guardian Alarm has alleged that Mr. Rossman made false statements to customers and sought to, quote, wreck and loot Guardian Alarm by his actions. If these allegations are found proven by the preponderance of the evidence, they would be a wrongful interference with contractors.

Finally, Guardian Alarm must prove it suffered an actual loss from the tortious interference. It must prove that, but for the tortious interference, there was a reasonable probability that Guardian Alarm would have maintained the contractual relationships and made a profit therefrom. To prove actual loss, Guardian Alarms does not have to prove the specific dollar amount of the loss.

….

The second counterclaim is a claim under the Connecticut Unfair Trade Practices Act.  Guardian Alarm also claims that Mr. Rossman's actions constituted an unfair trade practice and violation of the Connecticut Unfair Trade Practices Act.

In order to establish this claim, it must prove that Mr. Rossman was acting in a trade or commerce. And I defined that for you earlier. Further, Guardian Alarm's CUTPA claim must be evaluated under the governing three-part test, as was the CUTPA claim of Mr. Rossman, in order to determine whether the plaintiff's conduct was unfair. You must ask yourself, as you did with regard to the plaintiff's claim, these questions: whether Mr. Rossman's conduct, even if it was not necessarily unlawful, offended public policy as it has been established by common law, statutes or otherwise. Was Mr. Rossman's conduct immoral, unethical, oppressive or unscrupulous? And third, did Mr. Rossman's conduct cause substantial injury to consumers, competitors or other businesses?

In general, the party pursuing a CUTPA claim, in this case Guardian Alarm, does not need to show all three elements in order to demonstrate that an activity was unfair. And act or a practice may be unfair because of the degree, it meets one of the three criteria or because, to a lesser extent, it meets all three.

If Guardian Alarm proves Mr. Rossman's conduct was an unfair trade practice, then it must prove that it suffered an ascertainable loss as a result. I repeat. A loss is a deprivation, a detriment or injury. And a loss is ascertainable if it is capable of being discovered, observed or established. But it need not be measured by a dollar

5

amount. Once again, if you determine that Guardian Alarm has proved a CUTPA violation by Mr. Rossman, you must consider Mr. Rossman's special defense that Guardian Alarm has unclean hands. If Mr. Rossman proves that Guardian Alarm should not be entitled to a remedy on this count, you must find in Mr. Rossman's favor on this count. Otherwise, you must find that Mr. Rossman is liable.

Affidavit of Michael Lynch, Exhibit F (Bates 1215-1220).

The jury found in favor of Plaintiff and against Defendant on its Third Counterclaim, for unjust enrichment, in the amount of $25,000, Fourth Counterclaim, for tortious interference with contract, in the amount of $25,000, and Sixth Counterclaim, sounding in CUTPA, in the amount of $75,000.00.  Affidavit of Michael Lynch, Exhibit G (Bates 1270-1275).

As a result of post-verdict motions, Defendant was found liable for $42,438.50 of the Plaintiff's attorneys fees incurred in prosecuting the CUTPA violations, and for punitive damages in the amount of $25,000, again based on CUTPA violations.  Affidavit of Michael Lynch, Exhibit H (Bates 1301-1306).

Defendant appealed the verdict and the Court's decision on post-trial motions in three separate appeals, bearing the docket numbers AC-27290, AC 27970 and AC-28442.  The dockets for those appeals area attached to this affidavit as Exhibit L.  In each such appeal, the Appellate Court found for Guardian Alarm Services, Inc.  Mr. Rossman did not appeal to the Supreme Court.  Affidavit of Michael Lynch, ¶11, Exhibit H (Bates 1318-1322).

## II.     ARGUMENT

## A.     LAW ON SUMMARY JUDGMENT

Pursuant to Rule 56(c), incorporated by Bankruptcy Rule 7056(c), summary judgment is warranted only upon a showing by the movant that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986) (*quoting* Fed. R. Civ. P. 56(c)).  A fact is material when a dispute over that fact would

"affect the outcome of the suit under the governing law," and the resolution of a fact is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In reviewing the record, the Court must resolve all ambiguities in favor of the nonmoving

party.  Amnesty America v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir. 2004).  In order

to defeat a summary judgment motion, the nonmoving party must present specific material facts

and present sufficient evidence in support of them to show "the existence of not just

'metaphysical doubt,' . . . but rather, a genuine dispute requiring resolution at trial." Mitchell v.

Senkowski, 158 Fed. Appx. 346, 348 (2d Cir. 2005); In re Adler, Coleman Clearing Corp., 469

F.Supp.2d 112, 117 (S.D.N.Y. 2007) (*citing* Gallo v. Prudential Residential Servs., Ltd., 22 F.3d

1219, 1223-24 (2d Cir.1994)).


**B.     LAW ON COLLATERAL ESTOPPEL**

The Supreme Court has held that res judicata does not apply to bankruptcy courts in their

determinations of nondischargeability.  Brown v. Felsen, 442 U.S. 127, 138-39 (1979).

Collateral estoppel, however, also known as issue preclusion, is applicable in dischargeability

proceedings, and  may be invoked by the parties  to preclude relitigation of the elements

necessary to meet a §523(a) exception.  In re Hultman, 263 B.R. 402, 405 (Bankr. D. Conn.

2001) *citing* Grogan v. Garner, 498 U.S. 279, 284, (1991).  State-law determines the applicability

of collateral estoppel to a prior state-court decision. Id. citing Migra v. Warren City School Dist.

Bd. of Educ., 465 U.S. 75, 81, (1984).Conn. Dep't of Soc. Servs. v. Hultman (In re Hultman),

263 B.R. 402, 405 (Bankr. D. Conn. 2001) *See Spartz v. Cornell (In re Cornell)*, 178 B.R. 45, 48

(Bankr. D. Conn. 1995).

Connecticut law provides that for an issue to be subject to collateral estoppel it must have

been fully and fairly litigated in the first action.  Lafayette v. General Dynamics Corp, 255 Conn.

762, 772-73, 770 A.2d 1 (2001). Jackson v. R.G. Whipple, 225 Conn. 705, 714-15 (1993).

It also must have been actually decided and the decision must have been necessary to the

judgment.  Id.  An issue is actually litigated if it is properly raised in the pleadings or otherwise,

submitted for determination, and in fact determined.  Id.  An issue is necessarily determined if, in

the absence of a determination of the issue, the judgment could not have been validly rendered.

Id.  If . . . the judgment is not dependent upon the determination of the issue, the parties may

relitigate the issue in a subsequent action.  Id.

**C.     THE JURY VERDICT IN THE SUPERIOR COURT ACTION DETERMINED
THAT DEFENDANT TORTIOUSLY INTERFERED WITH PLAINTIFF'S
CONTRACTUAL RELATIONSHIPS, AND DEFENDANT IS COLLATERALLY
ESTOPPED FROM CHALLENGING LIABILITY FOR SAME UNDER §523(a)(6)
AND/OR §523(A)(2).**

**1.     Legal Standards for Willful and Malicious Injuries under §523(a)(6).**

Section 523(a)(6) provides an exception for any debt arising from "willful and malicious

injury by the debtor to another entity or the property of another debtor." 11 U.S.C. §523(a)(6).

"[W]illful" within the meaning of Section 523(a)(6) requires a "deliberate or intentional injury,

not merely a deliberate or intentional act that leads to injury. . . .…This standard is akin to an

intentional tort which requires that the actor intend the consequences of an act, not simply the act

itself."  Kawaauhau v. Geiger, 523 U.S. 57, 62-63, (1998) (internal quotations omitted)

(emphasis added); *see also* Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006).

While the Supreme Court did not address the meaning of "malicious" in *Geiger*, the

Second Circuit has defined the term in the context of the Bankruptcy Code to mean "wrongful

and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will."

In re Stelluti, 94 F.3d 84, 87 (2d Cir. N.Y. 1996).  Malice "may be implied by the acts and

conduct of the debtor in the context of surrounding circumstances and when anyone of

reasonable intelligence knows that the act in question is contrary to commonly accepted duties in

the ordinary relationships among people, and injurious to another.  In re Selig, 2018 Bankr.

LEXIS 165, at *21 (Bankr. E.D.N.Y. Jan. 24, 2018) (internal quotations omitted) *citing* In re

Akhtar, 368 B.R. 120, 130-31 (Bankr. E.D.N.Y. 2007).  Even in the absence of the terms

"malicious" or "malice" in a pre-bankruptcy state court decision, the bankruptcy court can infer

from prior factual findings whether the debtor's conduct was "malicious" pursuant to §523(a)(6).

Selig, *supra*; *See* In re Stanley, 66 F.3d 664, 668 (4th Cir. 1995) (noting that a particular debtor's

knowledge may be proved by circumstantial evidence and implied malice).  In addition, an injury

is "malicious" under § 523(a)(6) if the debtor's actions are "targeted at the creditor . . . at least in

the sense that the conduct is certain or almost certain to cause financial harm."  In re Koch, 2012

U.S. Dist. LEXIS 131854, at *11 (D. Minn. Sep. 17, 2012) (Judgment based on theft of trade

secrets nondischargeable under §523(a)(6)) *citing* In re Long, 774 F.2d 875, 881 (8th Cir. 1985).

### 2.     Legal standards for Causes of Action under §523(a)(2)(A)

Plaintiff's first count of its instant nondischargeability complaint alleges a cause of action

under §523(a)(2)(A), or a debt incurred by false pretenses, false misrepresentation, or actual

fraud.  "To be actionable [under §523(a)(2)(A)], the debtor's conduct must involve moral

turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law

9

(which may exist without imputation of bad faith or immorality) is insufficient."  In re Couloute,

538 B.R. 184, 188 (Bankr. D. Conn. 2015) *citing* In re Owen, 234 B.R. 857, 860 (Bankr. D.

Conn. 1999); In re Pierce, 323 B.R. 21, 27 (Bankr. D. Conn. 2005) (citations omitted).  "False

pretenses involve a misrepresentation implied from purposeful conduct intended to create a false

impression."  In re Carrano, 530 B.R. 540, 557 (Bankr. D. Conn. 2015); In re Miller, 282 B.R.

569, 575 (Bankr. D. Conn. 2002) (emphasis in original). An implication of false pretenses arises

when a debtor, with the intention to mislead a creditor, engages in "'a series of events, activities

or communications which, when considered collectively, create a false and misleading set of

circumstances, . . . or understanding of a transaction, by which [the] creditor is wrongfully

induced by [the] debtor to transfer property or extend credit. . . .'"  Carrano, 530 B.R. at  557

(Bankr. D. Conn. 2015)   Budnick, 469 B.R. at 174 (Bankr. D. Conn. 2012).  Alternatively,

"'[a]ctual fraud' is any intentional deceit, artifice, trick, or design used to circumvent and cheat

another, *i.e.* something said, done, or omitted with the design of perpetrating what is known by

the debtor to be a deception."  Carrano, 530 B.R. at, 557 (Bankr. D. Conn. 2015); Miller, 282

B.R. at 575.


### 3.   Defendant's Tortious Interference with Plaintiff's Contractual Relations is a Willful and Malicious Injury under §523(a)(6).

A claim for intentional interference with contractual relations requires the plaintiff to

establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's

knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4)

that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the

defendant's tortious conduct.  Rioux v. Barry, 283 Conn. 338, 351, 927 A.2d 304 (2007).

[F]or a plaintiff successfully to prosecute [an action for tortious interference] it must prove that

the defendant's conduct was in fact tortious. This element may be satisfied by proof that the

defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the

defendant acted maliciously." Landmark Inv. Grp., LLC v. CALCO Constr. & Dev. Co., 318

Conn. 847, 868-69 (2015); Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 805 (1999).

"The plaintiff in a tortious interference claim must demonstrate malice on the part of the

defendant, not in the sense of ill will, but intentional interference without justification." Id.

  In the Superior Court Action the jury found Defendant liable for tortious interference

with contract. Necessarily, pursuant to the above legal standard, that means that the jury found

that Defendant committed an intentional act substantially certain to injure the Plaintiff, without

just cause or excuse. The jury so found based at least in part Defendant's trial testimony clearly

evinces his intent to steal Plaintiff's customers, without regard to Plaintiff's rights:

> Q.   Okay. Now, let's talk about that for a moment. You knew that contracts had an automatic renewal. Any Guardian Systems contract had an automatic renewal on it year to year, right?
>
> A.   Yes.
>
> Q.   Okay. And so as an owner of the company you knew that the customers typically renewed year to year and didn't even give it a second thought, they just rolled over their contract from year to year, right?
>
> A.   Typically, yes. Sometimes.
>
> Q.   As a company you never went out to the Customer and said, your five years or three years contract was up, I want you to sign a new contract, did you?
>
> A   No.
>
> Q.   In fact you just stayed quiet because the customper most times did not even read their contract, and the alarm service continued year and year, right?
>
> A.   Yes.

Q.     So Guardian systems or whatever company had signed up the customer
       would just continue to receive monitoring revenues, right?

A.     Yes.

Q.     Okay.  And you knew all of that in the spring of 1997, right?

A      Yes.

Q      Okay.  So now as the renewal periods began to come up on these contracts,
       there were times when you knew what those renewal periods were or you
       asked a customer what their contracts said, and you suggested to them at
       that point in time that once the renewal runs out, rather than just letting it
       renew with Guardian, come on over with me, right?

A.     Yes.

Q.     You provided information on why United, in your opinion, was a better
       company than Guardian, didn't you?

A.     Yes, I did.

Q.     Okay.  You wanted to convert these customers over to your new company,
       right?  Yes.

Q.     And the reason you wanted to do that was because you did not want to
       wait around and wait for Mr. Terracino to figure out what kind of a
       settlement of your ownership interest was going to work out for both of
       you, right?

A.     In what time frame are you talking about? I waited

Q.     I am talking about through 1997.

A.     The end of '97 --by the end of '97, I agree, I wasn't waiting anymore.
       Correct.

Q.     You weren't.  But even before that you weren't waiting because you were
       cherry picking account off, weren't you?

A.     Well, we started in September of '96, so—

Q.     With discussions?

A.     With waiting. Yes.  Sure.

Q.     Okay. But by March of 1997 you were not waiting anymore, you were
       starting to invade Guardian customer accounts and have them switched
       over to United or one of your companies?

12

A.   I wouldn't say -- I would say March. I would say probably August when we started United.

Q    A lot of this effort on your part was really leverage against Mr. Terracino, wasn't it? It was continual prompting trying to get Mr. Terracino to respond and take your plan of payment for your ownership interest seriously, wasn't it?

A.   No. I would say by then it was survival. We had no money. We had law suits up the ying yang. I was in Court everyday, you know, with Jerry. At that point it was survival.

Q.   Okay.

A.   We needed the business.

Q.   And so at that point in time you did whatever you needed to do to get the accounts into your company so that revenues would start flowing into your company, right?

A.   Yes.

Q.   Okay. And you did it regardless of whether there was an existing contract or it was coming up for renewal. Whatever the status was, if it was an account primarily that you brought into the company at Guardian, it was an account that was ready for you to take over to United, right?

A.   Okay.

Q.   And you knew that Guardian was, to say the least, very unhappy about what you were doing, right?

A.   I am sure.

…..……

Q:   I am not pointing -- I am not looking to address that part of it. What I am looking at is a solicitation of each other's accounts or a raiding of each other's accounts. Was that part and parcel of any discussions regarding settlement?

A:   I felt if I got my 25%, that yes, I would honor a certain period of time. I believe, and Jerry can correct me if I am wrong, I believe we called it a no-take.

Q:   Okay.

A:   That for a period of time, if Jerry gave me my 25%, I would honor a no-take, even though more than 25% of the customers I had brought to the

13

company.  I would be happy with what I had coming to me, and I would not go and take customers from Jerry.  So, yes.

Q:      So until that agreement was put in place you had every intention of taking, right?

A.      Yes.

Affidavit of Michael Lynch, Ex F, (Bates 931-937, 952-953).

In rendering its verdict in Plaintiff's favor, the jury heeded the Court's charge and agreed with the Plaintiff that Defendant made false statements to customers and sought to "wreck and loot" the Plaintiff, despite Defendant's alleged special defense.  Affidavit of Michael Lynch, Ex F, G.  (Bates 1215-1220; 1270-1275).  Such actions constitute a willful act without just cause or excuse under §523(a)(6).  In re Langeslag, 366 B.R. 51, 59 (Bankr. D. Minn. 2007) (jury verdict on tortious interference with contract claim nondischargeable under 523(s)(6).

Admittedly, Judge Adams' charge to the jury interchanged the term "wrongful" with "tortious," and did not specify in the charge itself that Plaintiff was required to prove that Defendant's conduct was willful and malicious.  But this Court can certainly infer from Defendant's own testimony that he had the intent sufficient to satisfy §523(a)(6).  See  Selig, supra.  The Court can actually do more than infer this intent, as in his testimony Defendant admitted he targeted Plaintiff in stealing its customer accounts, an action certain to cause Plaintiff harm and that did cause it harm, in the amount of §25,000.00.  See Koch, Long, supra; In re Lopez, 378 F. App'x 610, 612 (9th Cir. 2010) (evidence supported inference that Debtor knew his conduct was substantially certain to injure creditor).

In addition, in its charge the Court advised the jury that

14

> [C]ompeting for the same business is not wrongful… Guardian Alarm has alleged
> that Mr. Rossman made false statements to customers and sought to, quote, wreck
> and loot Guardian Alarm by his actions. If these allegations are found proven by
> the preponderance of the evidence, they would be a wrongful interference with
> contractors.

Affidavit of Michael Lynch, Exhibit F, Bates 1216-1217.  In so instructing the jury, Judge

Adams required it to find that Defendant was not legitimately competing with Plaintiff but was

out to destroy its business in order to find for the Plaintiff – which they did.  When jury

instructions permitted an adjudication of liability on one and only one set of specific, predicate

fact-findings, the only inference is that the jury found those facts.  In re Langeslag, 366 B.R. 51,

60 (Bankr. D. Minn. 2007) (Debtor collaterally estopped from challenging liability for tortious

interference with contract, which was nondischargeable under §523(a)(6).  Those facts show that

Defendant acted willfully and maliciously in damaging Plaintiff's property and establish his

liability under §523(a)(6).

Accordingly, the Judgment in the Superior Court Action against Defendant as to tortious

interference with contract is nondischargeable under §523(a)(6).  Defendant's conduct was

actually litigated and necessarily determined to be willful and malicious, and Defendant is

collaterally estopped from challenging same.


4.      **The Jury's Finding that Defendant Tortiously Interfered with Plaintiff's
        Contractual Relations Required It to Find that Defendant Committed Actual
        Fraud under §523(a)(2).**

The Superior Court Action's jury verdict against Defendant as to tortious interference

with contract is also nondischargeable as actual fraud under §523(a)(2)(A), as an "intentional

deceit, artifice, trick, or design used to circumvent and cheat the Plaintiff." Carrano, 530 B.R. at,

557 (Bankr. D. Conn. 2015); Miller, 282 B.R. at 575.  As set forth above, Connecticut law

provides that conduct constituting tortious interference includes "fraud, misrepresentation . . . *or* that the defendant acted maliciously." Landmark, 318 Conn. at 868-69 (emphasis added).

Actual fraud under §523(a)(2)(A):

> embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). *See* In re Janssens, 449 B.R. 42 (Bantu. D. Md. 2010) (Debtor's silence led employer to believe he was working for employer's interest instead of against him and constituted actual fraud under 523(a)(2)); In re Sullivan, 305 B.R. 809, 824 (Bankr. W.D. Mich. 2004) (Debtor's "theft of a corporate opportunity by nondisclosure" constituted "actual fraud" under §523(a)(2)(A)).

Plaintiff alleged in its First Amended Answer and Counterclaim that Defendant made misrepresentations to customers to persuade them to breach their contracts with Plaintiff. Affidavit of Michael Lynch, Exhibit B (Bates 20-24). As referenced above, Judge Adam's charge to the on tortious interference also referenced Defendant's fraud in making "false statements to customers and [seeking] to, quote, wreck and loot Guardian Alarm by his actions." Affidavit of Michael Lynch, Exhibit F, Bates 1216-1217. Based on those instructions, the jury found Defendant liable. The jury's verdict in the Superior Court action on Plaintiff's cause of action for tortious interference with contract is therefore also nondischargeable under §523(a)(2)(A), and is likewise entitled to collateral estoppel effect.

**D.**     **THE JURY'S VERDICT FINDING DEFENDANT LIABLE FOR CUTPA VIOLATIONS WAS BASED ON PLAINTIFF'S CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT AND IS ALSO NONDISCHARGEABLE, AND DEFENDANT IS COLLATERALLY ESTOPPED FROM CHALLENGING SAME.**

**1.**     **Legal Standards for CUTPA.**

CUTPA provides in relevant part that "no person shall engage in unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

General Statutes § 42-110b (a).  The standard for determining a CUTPA violation under

Connecticut law is well settled:

> "Connecticut courts, when determining whether a practice violates CUTPA, will
> consider (1) whether the practice, without necessarily having been previously
> considered unlawful, offends public policy as it has been established by statutes,
> the common law, or otherwise--whether, in other words, it is within at least the
> penumbra of some common-law, statutory, or other established concept of
> unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3)
> whether it causes substantial injury to consumers (or competitors or other
> businessmen). . . . Thus, a violation of CUTPA may be established by showing
> either an actual deceptive practice . . . or a practice amounting to a violation of
> public policy."

Miller v. Guimaraes, 78 Conn. App. 760, 774-75 (2003)  (Citation omitted; internal quotation

marks omitted).

**2.**     **The Jury's Verdict in favor of Plaintiff on its CUTPA Counterclaim is Based on its Verdict in Favor of Defendant on Plaintiff's Counterclaim for Tortious Interference, and  Establishes Defendant's Liability under §523(a)(6) and §523(a)(2), and Defendant is Collaterally Estopped from Challenging Same.**

The jury's CUPTA award is likewise nondischargeable as to Defendant pursuant to

§523(a)(6) and §523(a)(2) because the jury based its CUTPA verdict on the same facts on which

it found Defendant liable for tortious interference with contract.  Plaintiff's Fourth Count of its

First Revised Answer, Special Defense and Counterclaim (the "First Revised Answer") sounded

in Tortious Interference with Contract, based wholly on the allegations contained in its Second

Count, labeled "Corporate Derivative Claim" and in which Plaintiff alleged Defendant stole its

customer accounts.  Affidavit of Michael Lynch, Exhibit **B**, Bates A0020-0034.  The Plaintiff's

CUTPA counterclaim was alleged in its Sixth Count of its First Revised Answer and

Counterclaim.  Id.  Said Sixth Count included the allegations of the First Count, which sounded

in breach of fiduciary duty, and the above described Second Count.  Id.  The First Count,

however, was asserted only in favor of Jerome Terracino, and not Plaintiff.  Id.

The inescapable conclusion is that the jury's verdict on Plaintiff's tortious interference

with contract and CUTPA counterclaims were both based solely on the allegations that Mr.

Rossman "made false statements to customers and sought to wreck and loot Guardian Alarm by

his actions."  It necessarily follows that the CUTPA counterclaim is also nondischargeable on the

basis of §§523(a)(6) and (a)(2), for the same reasons as the judgment on the tortious interference

counterclaim.  In other words, Defendant's actual fraud and willful and malicious conduct are

nondischargeable pursuant to §§523(a)(2)(A) and (a)(6), both under tortiously interference with

contract and as a CUTPA violation.

Several courts have held that state-court findings in actions involving unfair trade

practices claims may meet collateral estoppel standards for nondischargeability purposes.  *See* In

re Sarff, 242 B.R. 620, 628 (6th Cir. B.A.P. 2000) (finding compensatory damage award for

breach of duty of loyalty nondischargeable where it arose from same actions as other damages

awards for which an explicit finding of willfulness had been made by the state court); In re

George, 205 B.R. 679, 681-82 (Bankr. D. Conn. 1997) (Krechevksy, J.) (Plaintiff's state law

CUTPA judgment based on Debtor's fraud nondischargeable under §523(a)(2); In re Keach, 204

B.R. 851, (Bankr. D.R.I. 1996) (state-court action, where jury found debtor engaged in unfair

18

and deceptive trade practices, constitutes a proper basis under collateral estoppel elements to

grant judgment as a matter of law pursuant to §523(a)(2)(A)); In re Bebber, 192 B.R. 120, 122-

23 (W.D.N.C. 1995) (bankruptcy court can rely on state-court findings regarding creditor's unfair

trade practices claim against debtor to determine whether creditor's claim came within discharge

exception for fraud); In re Kochekian, 175 B.R. 883, 889 (Bankr. M.D.N.C. 1995) HN11 (civil

judgment against debtor in action alleging fraud, deceit and unfair and deceptive trade practices

met requirements for collateral estoppel for § 523(a)(2)(A) purposes).

For all of the above reasons, Defendant's debt to the Plaintiff based on his liability under

CUTPA is nondischargeable under both §523(a)(2) and (A)(6).  The issue was properly raised,

actually litigated, and necessarily decided, and Defendant is collaterally estopped from attacking

same.

**E.      THE COURT'S AWARD OF PUNITITIVE DAMAGES AND ATTORNEYS'
         FEES AGAINST DEFENDANT ARE ALSO NONDISCHARGEABLE**

The Court's award of attorney's fees and punitive damage arising out of the jury's

CUTPA verdict against Defendant are also nondischargeable.  In Cohen v. de la Cruz, 523 U.S.

213 (1998), the Court held that §523(a)(2)(A) "prevents the discharge of all liability arising from

fraud"—including "an award of treble damages"—and not merely "the value of the 'money,

property, services, or . . . credit' the debtor obtains through fraud." Id. at 215.  The Court noted

that §523(a) consistently uses the word "debt" to "connot[e] broadly any liability arising from

the specified object." Id. at 220.  Moreover, the Court reasoned, if the defendants were correct

that "the fraud exception only barred discharge of the value of any money, property, etc.,

fraudulently obtained by the debtor," then "the objective of ensuring full recovery by the creditor

would be ill served." Id. at 222.  The Supreme Court doubted that Congress "would have favored

19

the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of

fraud," and therefore held that the wrongdoer's "entire debt"—including "relief that may exceed

the value obtained"—was "nondischargeable in bankruptcy." Id. at 223.

Courts have extended this logic to nondischargeable claims under §§523(a)(4) and (a)(6),

holding punitive damage and/or attorney's fees awards related same as also nondischargeable.

*See* In re Hambley, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005); In re Barlow, 478 B.R. 320, 333-

34 (Bankr. S.D. Ohio 2012) (§523(a)(6); DirecTV, Inc. v. Karpinsky, 328 B.R. 516, 528 (Bankr.

E.D. Mich. 2005) (statutory damages and attorneys' fees awarded for satellite signal piracy were

nondischargeable under § 523(a)(6)); In re Braun, 327 B.R. 447, 452 (Bankr. N.D. Cal. 2005)

This Court should likewise do so here, and hold that the Superior Court's awards of $42,438.50

in attorney's fees and $25,000 in punitive damages based on Defendant's CUTPA violations are

nondischargeable under §§523(a)(6) and/or (a)(2).

## E.   CONCLUSION

For all of the above reasons, Plaintiff respectfully requests that this Court grant its

Motion for Summary Judgment.

**PLAINTIFF**

_____/s/_____
Scott M. Charmoy, Esq.   CT 15889
Charmoy & Charmoy
1700 Post Road, Suite C-9
Fairfield, CT 06824-0804
(203) 255-8100
scottcharmoy@charmoy.com